Good morning, ladies and gentlemen. We have five cases on the calendar this morning, three patent cases, a veteran's appeal, and an employee appeal that is not being argued, it's being submitted only on the briefs. Before we get to our main business, though, we have a pleasant family occasion to celebrate, and I have a motion to make, and having made the motion, I will turn the proceedings over to Judge Moore for her action. I move the admission of David Kenji Stark, who is a member of the bar and in good standing with the highest court of California. I have knowledge of his credentials, and I'm satisfied that he possesses the necessary qualifications. And I have that knowledge because he has been my law clerk for almost two years. He has deep knowledge of the law and technology. He's a hard worker, he has good judgment, and he's enjoyable to work with. He has served me well, and I'm confident that he will be a success in his future endeavors. So, I therefore move his admission to the bar of this court. We debated for a while. We've decided to grant the motion, and I wanted to say hello to your wife and baby daughter. David, would you please prepare to take the oath? Please raise your right hand. Do you solemnly swear or affirm that you will comport yourself as attorney and counsel of this court uprightly and according to law, and that you will support the constitution of the United States of America? I do. Welcome to the bar of the United States Court of Appeals. Welcome, David. We then proceed with our business. The first case is Multimedia Patent Trust versus Apple and LG Electronics, 2013-16-20. Ms. Sullivan. Thank you, Your Honor, and may it please the court. Kathleen Sullivan from Multimedia Patent Trust, which I will sometimes refer to as MPT. Your Honor, this case involves infringement by equivalence of means plus function claims in patents concerning the transmission of high-resolution video. We pursue three errors before you, and I'd like to start with the instructional error. We argue that the jury instruction on means plus function claims here was erroneous under this court's decision in Odetics because the district court, sua sante, added a qualification to the Odetics instruction that erroneously instructed the jury to engage in the very component-by-component analysis that Odetics, over, of course, the powerful dissent, instructed was improper. Without talking about the dissent, of course, the district court said look at a component only in respect to making a judgment about the overall structure, didn't it? It did, Your Honor, but crucially, it qualified that. The words overall structure are in there, but the paragraph we object to, Your Honor, is at A3384 to 85. And I think it's important to read it out to Your Honors because here is where the district court added the undermining part of the instruction. The district court instructed that differences between the components in the structure I have identified and the components in the structure in the product I'm sorry, I'm having trouble finding the instruction for some reason. I'm so sorry, Your Honor. Did you say it was? 3384 to 85.  Your Honor, do you have it now? 3384 to 85. So it's Volume 3 of the Bound Appendix, close to the front of that appendix, 3384 to 85. While I agree, Judge Lurie, that the first part of the instruction, the paragraph beginning at lines 14 to 22, captures the overall structure point that's the core of odetics, it's the following paragraph that we find erroneous and respectfully think requires a new trial. If we read it verbatim, you'll see why. Differences between the components in the structure I have identified and the components in the structure in the product can be considered if the differences are such that it renders the overall structure in the product substantially different from the overall structure I have identified. In particular, where the different and or missing component is a component that plays a central role in the identified structure. Now what this did, Your Honors, is in a sense tell the jury to look through the wrong end of the telescope. We don't dispute that the components are properly part of the evidence. The components inform the view the jury should take of the comparison between the overall structure. What we do dispute strenuously is that the jury should focus on component-by-component analysis, which they're invited to here, and the compounding error is that the district court described a centrality concept, which the district court failed to define. So the centrality qualifier doesn't cure the problem. If anything, it makes it worse, because what the court said is you can look to a central component as a particular problem, but component-by-component comparisons are what are invited here. Now why this is so important... I don't understand that that's what this says. It says you can look to a central component and see if its differences are such that it renders the overall structure substantially different. I don't understand it to say if the central component is different from the other component, that's good enough. Well, Your Honor, the jury is invited to start from the granular level of component-by-component comparison. And that was very important in this case, because, of course, the way that the defendants presented the evidence was... Only if the components teach you that the overall structure is different. He did exactly what you asked. He didn't allow the jury to be instructed that it was okay to do a component-by-component analysis and just compare individual components and stop there. It is only if it results in a determination factually that it makes the overall structure different. With respect, Your Honor, if the district court had stopped at line 22, I would agree with you. But she didn't. She went on to instruct that component-by-component analysis is permissible. That's looking from the ground up rather than from the top down, so to speak. And why that matters, Your Honor, is this instructional area... She did say component-by-component was permissible. She said only if its analysis resulted in the overall structure. If that part wasn't in the sentence, you'd have a great case. But she made it clear to the jury the test, even when looking at components, is how do they leave you with regard to the overall structure. Your Honor, let me try a simple example and try to get at what I mean. We're not... Suppose, as to take Judge Huff's example, suppose we had a means-plus-function claim for a means of highlighting with transparent ink. And suppose the components were a pen, a cartridge, and the ink. Well, it would be an infringing use to change the ink from water-soluble to oil-based ink, but it would not be an infringing use if you changed the component from ink altogether to, say, a transparent tape used for highlighting. So I'm not suggesting that we think that components aren't part of the analysis of overall structure, but it's a very different thing to ask the jury to go component-by-component and say, aha, water-based ink is not oil-based ink. That's the kind of analysis that was invited here. And the reason why it was so egregiously prejudicial, Your Honor... Well, I just don't agree with your characterization of the instruction at all. Well, Your Honor, if... I think you're... Let me turn then to... I want to be clear that we did not waive objection to the instruction, and I can recite the places in which we didn't. But, Your Honor, what the district court did is come up with a notion that component-by-component is the way to decide whether the overall structures are comparable. Ms. Sullivan, I want to ask you about the Apple license defense. Why don't they have an adequate license defense? Your Honor, the license defense failed, and there should be, at a minimum, a new trial on the product supposedly subject to the license because both the 2002 license, originally from the MPEG-LA patent pool, and the 2011 license were field-of-use licenses and not product licenses. To start with the 2002, so, in other words, they covered only the use of the MPEG-2 technology, not any product... The license originally was field-of-use. You're not relying on 2.7. Your Honor, originally we rely on 2.8. I'm sorry. We rely on the original license, 2002, being a field-of-use license. The only reason the district court said it was a product license is the line in section 2.8. That's at A10352, and that section said that MPEG-2 compliant technology that also includes MPEG-1 compliant technology is included. It's not excluded from the license. And the district court, with respect, erroneously read that as a product license clause. It's not a product license clause because MPEG-2 is backward compatible with MPEG-1. But what we're objecting to in the Apple license claim is H.264 technology, which is not... MPEG-2 is not backward compatible with that. So, Your Honor, we think the district court misread that one sentence to create product licensing where it didn't. It's a field-of-use license. But in any event, Your Honor, even if you disagree on 2002, 2011 is a slam dunk for MPT because 2011 is an express field-of-use license. And, Your Honor, that's 2.7. 2.7 is at page A10135. Why isn't that void? It's not void, Your Honor, for two reasons. Because Apple's unilateral side letter to MPEG disclaims nine sections explicitly. The side letter is at A1039. Well, you say it's unilateral, but on the bottom of it it says agreed to by MPEG with a signature. So I... It seems like an agreement rather than a letter. Your Honor, even if it's an agreement, expressio unius, exclusio iletarius, there are nine enumerated sections. 2.7 is not one of them. And the words including but not limited to are far too indefinite under New York law. Sorry, Your Honor. No, I remembered the phrase including but not limited to, and you just answered it. Okay. Even if you disagreed with me on all of that, Your Honor, the license is a field-of-use license because the amendments to royalty terms and rates are non-disclaimable. That's at A10364. And the scope of license, whether it's what products it extends to and therefore what royalty rates are paid, is directly related to royalty rate. So at a minimum, new trial on the supposedly licensed product. What troubles me about that is it seems that if I give... Clearly it's not a rate. Clearly this field-of-use provision is not a royalty rate, right? So yes or no? Yes, Your Honor. Okay. So when it says royalty terms, you're saying it must be one of the royalty terms. Yes, Your Honor. Royalty terms would include scope to which the rate is applied. But then it's the whole ball of wax. What's left? We think not, Your Honor. There may be lots of other provisions that don't go to the cash value of the damages, but scope does. And so it's a spectrum, but we would submit that this is one that's closer to royalty. Wouldn't the more natural rating of royalty terms be the term of duration, the time of the license? Because that's exactly what would be changed from one license expiration. Correct, Your Honor. Those two, but scope, we would submit, is included in the non-disclaimer clause. But we think the principal argument... You need to go no further than the fact that the side letter failed to disclaim 2.7. You're done. But, Your Honor, with my small remaining time, I wonder if I could say briefly why we think the claim construction is erroneous. And let me simplify this down to really two points. There's no controversy here about how claim construction works in an infringement by equivalence of a means plus function claim. The identified structure must not incorporate structure from the written description beyond that necessary to perform the claim function. So no unclaimed functionality. And the identified structure, the corresponding structure to the function that's claimed must not merely enable the structure to operate. It must actually perform it. The district court committed two kinds of errors in her claim construction. She was careful, she was meticulous, but she absolutely committed those two basic errors. Let me give you one example of each. Claim 1 of the 377 patent. Let's just look to the prediction means. The prediction means is a prediction means for predicting a next frame signal. And when you look at this, claim 1 of 377 for prediction means it's only motion compensator 43 that is the structure that actually performs the function of predicting a next frame signal. The district court erroneously included the leak factor multiplier 45. This is just an easy example. Leak factor multiplier 45 was improperly included. It's unclaimed functionality. The application of a leak factor is a different function, performs a different function from predicting the next frame signal. It's part of the prediction process, isn't it? I mean, we're dealing with a leaky prediction. It is not. Your Honor, with respect, and this is a very important point, if I could refer you to the preamble. The preamble claims prior art prediction, and leaky prediction is not part of prior art prediction. Your Honor, the preamble is, the patent is in A349. Right, that's a new argument you made, right? About the Justin Claims? It is, Your Honor. No, it was made below. Let me double check. But Your Honor, the key point is, if you look at page A337, A337 lists the other patents, and you'll see there that there's an application for a separate patent to cover adaptive leak HDTV encoders. At the top of the page, the third additional patent is an adaptive leak HDTV encoder. That's good evidence that the claimed means of prediction was not to include leaky prediction. If I could reserve the rest of my time for rebuttal. Ms. Sullivan, before you sit down, I have a question. Do you have to prevail on all three claim constructions to warrant reversal, or do you have to prevail on only one? Only one, Your Honor. We think that because any of the... The jury might have decided, especially given that Dr. Bovik, the defendant's expert, put Xs through lots of components. We think compounding the error in the component-by-component instructional analysis. We're not talking about that. But, Your Honor... I'm talking about the three means clauses. We don't... Do you have to win on all three of your proposed claim constructions, or only one? As to each claim, only one. So as to the 377 Claim 1, we don't win on any of the three elements. If we prevail, we win on Claim 1, and we need a new trial on that claim. As to 878, either of the claimed... Either Claim 13 or Claim 31. Could you explain that? I mean, what if I happen to think that Judge Blow got it right on means for developing a framed different signal, that she identified the two subtractives correctly? And... But maybe you're right about the quantizing means. Why did that warrant returning this back to the court? Because, Your Honor, we have a general verdict form, and we have no basis to know which of the many Xs that crossed out a component was the basis for the jury's finding of non-infringement. And if the jury found any basis of difference, a basis for non-infringement, we can't know. There wasn't a specific verdict form, and therefore it has to be a specific... So how could you be heard now... No, you didn't. How could you be heard now to complain about the absence of a specific verdict form when you neither asked for one nor objected to the failure to give one? We're not... We're not complaining about the absence of the specific form. We're just relying on eye for eye that you presume prejudice from a general verdict form, and that we can't tell which of the basis for non-infringement the jury relied on. Your Honor, may I respectfully ask for rebuttal? We've asked a lot of questions. We'll give you your three minutes back. Thank you very much, Your Honor. Mr. Kostanius, you are splitting your time with Mr. Barnes. Mr. Barnes, yes. And just as a... Good morning, Your Honor. May it please the Court. Just as a housekeeping matter before we start, I'll take nine minutes and address the jury instruction and Apple license issues. Mr. Barnes has six minutes, and he'll address the claim construction issues. So I hope that I'll be able to get through the responses on the two issues I've taken in less time. We're sure that you will. Hopefully Mr. Barnes will be able to take some of that time. Let me start with the jury instruction issue. Ms. Sullivan said that she was going to tell you why they hadn't waived. We didn't hear the answer, but I'm going to tell you why they did waive the challenge here. If the Court is to look at page 830, 41, and 42 of the record, you'll see where Judge Uff informs the parties that she has found Toro and Solomon, two cases, by the way, that Ms. Sullivan did not mention in her argument, and believes that the language that they now find to be offending language, she's drafted to add to the jury instruction. And she says, I'm going to give this instruction at 3041. She then says, and then the Court has considered your other objections, the ones that have already been lodged, and then overrules those. So obviously that's not an objection to this new instruction. So then the Court, she says, the Court will print out a final set, and then she invites, going over to 3042, are there any other final comments on the jury instructions? That was sprung on everyone pretty late in the game, right? It was after the experts testified. But Judge Chen, the important part of this is where she invites the comment. This is Rule 51. Objections have to be made at the time. Mr. Lorick says no, Your Honor. Now, to your point. Aside from waiver, was the instruction improper? Of course not, Your Honor. It was exactly proper. It was a proper instruction, not only under Odetics, but also under Toro and Solomon. Here's the thing. In Toro and Solomon, in both of those cases, the patentee had himself admitted in the patent or the prosecution history that one of the individual components played a central role. In one of the patents, it said something like indissensible, and in the other patent, it actually distinguished the CAM over prior art versions of the other component. The patentee himself stressed the centrality of this component as part of the means structure. How was this jury to figure out what was a central component or a non-central component? Because this instruction was given at the end, after all the expert testimony. They couldn't go back and present testimony on centrality or anything like that. So how was the jury to figure that out? Well, first of all, if that was indeed, as Ms. Sullivan said, an egregiously prejudicial error, then putting aside the objection, then there should have been a further request for an instruction about centrality. But the simple fact of the matter is that that's the way that the experts testified. And Toro and Sullivan are not the only cases. Did they use the word central component in their testimony? I don't think you saw the word central specifically. It wasn't tailored to that specific word. But if you look, for example, at Dr. Bovik's... Sure would have been if the experts knew in advance this was going to be used first. But you see the same concept coming across, particularly in Dr. Bovik's testimony, which we've cited at page 29 of the red brief. I can give you a particular cite here if you'd like that. But the main point is that as Toro, Sullivan, and the cases that we've cited at footnote 10 of the red brief at page 25 show, this court frequently looks to the absence of a particular individual component in an overall structure to determine whether or not there is means plus function claim infringement. And three of the four cases, I might add, that are cited at footnote 10 at page 25 of our brief are cases that follow and indeed rely on odetics for that proposition. Using the standard for testing a jury instruction's correctness, which is does it fairly and adequately cover the issues presented and state the law without being misleading, this instruction is perfectly appropriate. It always told the jury to keep the eye on the ball of overall structure. It always said. Judge Moore, you're questioning to my friend here, made that absolutely clear. You didn't agree with her perception of the instruction. The jury instruction also invites the jurors to look at the components, right? And then... Of course, because all structures... See if it can hunt for a component with a central role. I don't think it says that you should hunt for one. I think it says the offending language is that the structure, the components in the structure can be considered, if the differences are such, that it renders the overall structure in the product substantially different from the overall structure I have identified. And then she says, in particular, where the different and or missing component is a component that plays a central role in the identified structure. So how do you reconcile the two principles? You're supposed to look at all the components overall, that together, collectively, to perform the function. And yet, at the same time, you can look around at the components on an individual level. Well, Judge Chen, I think Toro and Solomon in a large way answered how you reconcile that. This instruction was very apt reconciliation of all of this court's precedents, because every overall structure is made up of individual components. Even Ms. Sullivan's hypothetical example of the highlighting pen, she broke down into individual components and talked about how it would be different if you used a different kind of ink versus if you used tape. That's an appropriate inquiry under 112-6 or what's now called 112-F. If I could turn... What about the license defense? Let me turn to the license defense very quickly. It's important to understand that in the 2002 license agreement, there was a paragraph 6.1. And that paragraph 6.1 said that you may renew, Apple, you may renew this agreement for a five-year term, and the only thing we can change, says MPEG-LA, are royalty terms and rates. We can only make research... Why didn't you cross out 2.7? I'm sorry? Why didn't you cross out 2.7? Well, you know, the interesting thing, Judge Chen, is that when you look at the whereas clause that's on the first page of the letter attachment, and just to be clear, that is specifically called out as an attachment, which makes it part of the integrated whole document of the 2011 license agreement along with the 2009 form license. But if you look at that whereas clause, that is showing the places where the parties disagreed about what terms were royalty rates or not. So, for example, even a provision that was in Section 3 of the agreement, which is the royalty rates provision, was viewed by Apple as going too far, not being a royalty rate or term. MPEG-LA disagreed with that evaluation, but ultimately agreed. And so on those things, they may have kicked the can down the road for another day. Maybe everything is hindsight at this point, but 2.7 is kind of an eye popper. You would think that's very clear what the intentions are of the 2011 license. We didn't disclaim it. Again, we're looking at hindsight and we're looking at four corners of the document, but it seems to me, just looking at the four corners of the documents together, it's quite clear that it was outside of the royalty provision, which is Section 3 of the document, and was such a sea change. I think Ms. Sullivan used the term slam dunk to describe the difference between the 2009 language and the 2002 language, but it was such a sea change from the approach that was taken in 2002 that it's perfectly plausible to conclude that parties didn't have a disagreement that that provision was not a royalty term or rate. So you didn't mention it in the letter because you thought it was so clear they'd agree with you that it wasn't included? That's your argument, basically. No, but it is clearly not a royalty term or rate. In fact, it's completely the opposite side of the royalty analysis, Your Honor, because as you pointed out in your questioning to Ms. Sullivan, if that's a royalty term or rate, pretty much everything in this agreement is a royalty term or rate, because that has to do with the scope of the license. Why don't you tell me about some of the ones you actually pointed to, 1.19 or 1.22 or 3.19. Tell me how they differed in any material respect from this particular scope argument, such that you would have cited those, but not this, not 2.7. Is there some way in which I could distinguish the ones you chose to list from the ones that you didn't list that's the big one in dispute here? Well, I think, first of all, I've offered you one way, and that is that those are the ones that... Yeah, but that doesn't make sense, so what about another way? All right, so we'll walk through them if you'd like, and I realize I'm running out of time here, but 1.19 changes the definition of the MPEG-2 standard. That is 1.22... You're right, that seems like that would really clearly not be a royalty term or rate, but 2.7 seems a little closer, doesn't it, than that? Because the scope of what we're supposed to get royalties on versus the definition of the technology... And again, Judge Moore, it may very well be that... The specific terms that were pointed out in the whereas clause were the ones that MPT... I'm sorry, M-L-A... You're out of time, but I want to ask one more question. What is a royalty term, then? It's not just a rate, right? Because you said royalty terms and rates. So what is a term? So I think that you offered a perfectly plausible understanding of term, which is that the... Is that the one you offered? Well, it's not. No, I know. But it goes further, because I think the way to understand it is to go back to 6.1 of the 2002 agreement. Remember that that said, no amendments except for reasonable changes to royalty terms or rates. Well, in the 2002 agreement, where would you look? You'd look to Article 3. And so the provisions that are in Article 3 of the 2002 agreement are those that should not be... that are plausibly changed. And if I can just give you a couple of examples of that, 3.1.7 in the 2009 agreement changes and provides an alternative royalty computation option. Section 3.5 in the 2009 agreement changes the payment method from check, cashier's check, or other acceptable means, to wire transfer or other acceptable means. Section 3.7 of the 2009 agreement changes the late payment provision from 14 days past due to past due is when a late payment arrives. Well, but one of the ones you object to is 3.19. Well, that's in the 2009 agreement, and that makes perfect sense because... Is it 2009 or 2011? Well, it's just... I'm sorry. My terminology hasn't been clear. 2009 is when MPEG-LA adopted that as its new form license. 2011 is when Apple entered into it. But 3.19 is objected to, and that's in the royalty term section. Well, that's because in the 2009 agreement, MPEG-LA decided to put that into the royalty term section, and Apple said, no, no, no, no, this one's not a royalty term. This one's election of remedies. That should be somewhere else. Thank you, Mr. Castanis. We'll hear from Mr. Barnes now. Thank you, Your Honor. Good morning, ma'am. Please support Justin Barnes from Fish and Richardson on behalf of the appellees, and like Mr. Castanis said, I will be focusing on the claim instruction. I'd like to start with Judge Moore's question about the import of this and whether MPT has to win on all these. And I think a critical point here is that we put in our red brief on page 28 the fact that MPT's importer and its experts at trial did not introduce any evidence on the function for each of the claims at issue, and thus any dispute over the structure is frankly moot and irrelevant if the functional language hasn't been satisfied. And also, let me give you one example. Claim 31, which is the encoder claim on the 878, MPT has said the motion estimator 37 shouldn't be included. We made no non-infringement argument on that particular component. We made no non-infringement argument on that entire claim element. And thus, MPT has utterly failed in its briefing to point to any nexus between these alleged errors in the claim instructions and the actual judgment of non-infringement that was found by the jury here. The issue here relates to the quid pro quo of 112.6, now 112.f. Everyone, the experts, the parties, the inventors, all agreed that the basic functions of video encoding and decoding existed well before these patents were filed, and that these patents related to specific functions, or sorry, specific structures for implementing those well-known functions. But when it came time for claim construction, MPT tried to shirk its half of the statutory bargain. What it tried to do is eliminate the very structures that were the basis of the 377 and 878 patents. And Judge Huff, who has 10 years of experience with this, three Markman hearings, two trials, hundreds of pages of briefing from experts and the parties, came up with a 200-page claim construction order, 70 pages of written opinion, 125 pages of addendum charts... What does that have to do with prediction means? Stop blabbering on about how many pages this was and that was. Get to the heart of your argument. Why should all of these components be considered part of the structure or not? Because that's what the inventors disclosed in their patent applications. They disclosed a method, a structure, of using leaky predictions. Show me where the multiplier, which is element 45, is anywhere in the specification linked to predictions, function predictions. Okay. You'll be happy to, Your Honor. So the issue with that, the strongest quote that I can give you for that is at A343, column 13, lines 21 through 22, which states that the leak factor must always be present. Yes, Your Honor. Line what? 21 through 22. That's stating that the leak factor must always be present. In other words, as you go through this prediction, the leak factor must be used in every instant. There's no disclosure of any prediction means not including a leak factor, not including that multiplier 45. I must be confused. Did you say column 13? I did say column 13, Your Honor. Okay, line 21. This says, I'll give the exact language. What does that have to do with predicting? Are you reading from 2019? Yeah, for example, the leak factor cannot be allowed to reach and stay at one. What does that have to do with a prediction mean? Leaky prediction was the specific implementation that was disclosed by the inventor, sir. They testified to that at trial. Mitt Sullivan even pointed to one of the articles that talks about leaky prediction as an alternative to something called perfect prediction, but the only disclosure in the patent is this leaky prediction utilizing the leak factor. There's no disclosure whatsoever. Well, if that's the case, then why didn't you suck in the actual circuitry that comes up with the leak coefficient? If that's what really is doing the prediction, the multiplier is just taking the leaky number that comes out. Why not all the circuitry that comes up with the leak number itself? Two things. I'm probably saying it wrong, technically. Two things. If you don't understand my question. Yes, I do. Okay. One thing, we tried to get that included. Judge Huff disagreed with us. But secondly, the fact is none of these particular structures by themselves do the entire prediction process. MPT points to motion compensator 43 theoretically doing the prediction, but even MPT proposed the inverse DCT39, the inverse quantizer 40. It's all of those various structures that come out of QVS38 and circle around and come back up and subtract to 36. It's all of those working together that do the prediction. And the patent describes that entire process starting at the bottom of figure 5, line 60, and going through about the middle of column 6, line 39. It describes how all of those structures are interrelated and work together to perform the claim prediction. And why did you leave the buffer out in the middle? Judge Huff left out the buffer because that really does... They included the other buffers. There's at least three, right? I can't find the picture. But there were at least three buffers in that loop and then one is suddenly not part of the construction. I think the buffer had to do with a simple... I'm getting the sense that what you got, you're happy with, but may not have been exactly what you wanted. Exactly. And the point is that Judge Huff's construction wasn't exactly what we asked for. It wasn't exactly what they asked for. It was what she, after hearing hours and hours of testimony, came up with as what she thought was the most correct structure for the particular functions here. And I'll note that I'm out of time, so if there's any further questions... Fine. Thank you, Mr. Barnes. Ms. Sullivan has three minutes of rebuttal. Thank you, Your Honor. I think Mr. Barnes has just shown you what's wrong with the claim construction here, and that is that the district court here limited the claims to the preferred embodiment. When you asked him, where do you get leaky prediction, he took you to the specification. He took you to Column 13. And that's exactly what we object to here with respect to the Claim 1 of the 377 patent. The patentee... I don't need to tell this court that the patentee is his own lexicographer. When the claim limitation says that Claim 1 of 377 is a means for predicting, it does not include leaky prediction. Leaky prediction is covered by other patents. And, Your Honor, with respect to the Jepson claim... I didn't see any of the claims in this patent talk about leaky prediction. It just talked about prediction means. Correct, Your Honor. And leaky prediction means encompasses this insight of using leaky prediction. Well, Your Honor, we believe that the leaky prediction is covered by other patents. It's not part of the prior art. We think when you read the claim limitation on page 377, respectfully, it is a prior art encoder patent claim. And the Jepson claim, Your Honor... Wait, wait, wait. You chose to claim in means plus function language, but now you'd like us to exclude the structure disclosed in the spec in favor of only what structure may have been known in the prior art. That's not the way it works. If you choose to claim in means language,  You don't get to eliminate some of the elements in the spec because they weren't the prior art, and now we're going to characterize this as a Jepson claim. But, Your Honor, let me focus on the term disclosed. Lots of what's disclosed in the patent is not what is essential to perform the structure that corresponds to the claimed function. All we argue is that the claimed function must correspond to the structure in the specification that is necessary to perform it. And leaky... But it says prediction means responsive to said encoder output signals. 43 is not responsive to an encoder output signal. By then, the signal has been modified substantially and is no longer an encoder output signal. The only thing that's responsive to an encoder output signal is number 39 in the picture. After 39, it's no longer an encoder output signal. So if 39's not part of the prediction means, then you're really in trouble. You've got an indefinite claim here because 43 isn't responsive to that. Your Honor, invalidity wasn't presented below, so I take your point. But just the last point I'd like to make, if you look at the 878 patent, and I want to focus you on how the patentee should be entitled to define the function that is claimed. The patentee claimed that the prediction analyzer 38A alone is the structure that performs the function of producing a motion compensation-type signal. And the district court was correct in... I'm sorry, Your Honor. I'm sorry, Your Honor. No, I wasn't asking a question. I'm sorry. Well, let me close simply by... All of this is in our briefs. We've argued at length what is really at stake here is are you going to allow infringement by equivalence of means plus function claims to be undermined by a claim construction that throws a lot of components into the identified structure that really do not perform the claim function? And if you do that, the error was compounded here by a jury instruction that invited the jury to draw a red X through many components that were not part of the structure required to perform the claim function. The twin effect of the claim construction error and the jury instruction error here  and remand for a new trial. Thank you, Your Honor. Thank you. Ms. Sullivan will take the case under review.